CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED

August 02, 2024
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

|  |  |  |
|---|---|---|
| CHRISTOPHER A.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-CV-00488 |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | |
| Commissioner of Social Security, | ) | By: C. Kailani Memmer |
| | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Christopher A. ("Christopher") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). I now submit the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

For the reasons detailed below, I recommend the presiding District Judge **AFFIRM** the Commissioner's final decision and **DISMISS** this case from the Court's active docket.

**STANDARD OF REVIEW**

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Christopher failed to demonstrate that he was disabled

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

## CLAIM HISTORY

On August 9, 2021, Christopher filed an application for DIB, alleging disability starting on June 14, 2019. R. 72–73. The Commissioner denied Christopher's claim initially and on reconsideration. R. 72, 99–100. On March 19, 2022, Christopher requested a hearing before an Administrative Law Judge ("ALJ"). R. 108–09. On November 18, 2022, Christopher appeared before ALJ Thomas Erwin by telephone. R. 44–71. Barry Hensley testified at the hearing as an impartial vocational expert. R. 67–70. On December 28, 2022, the ALJ entered a decision analyzing Christopher's claims under the familiar five-step process[4] and denying his request for benefits. R. 15–38.

At the first step, the ALJ found that Christopher had not engaged in substantial gainful activity since June 14, 2019, the alleged onset date. R. 20. At the second step, the ALJ found that Christopher has the following severe impairments: somatic disorder, depression, anxiety, degenerative disc disease of the cervical spine, fibromyalgia with myalgia, chronic fatigue, subarachnoid cysts, migraines, hemochromatosis, and obesity. R. 21.

As to the third step, the ALJ found that Christopher's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 23. The ALJ specifically considered

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460-62, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root), 1.16 (lumbar

spinal stenosis resulting in compromise of the cauda equina), 1.18 (abnormality of a major joint in

any extremity), 1.21 (soft tissue injury or abnormality under continuing surgical management),

5.00 (digestive disorders), 7.00 (hematological disorders), 12.04 (depressive, bipolar, and related

disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.07 (somatic symptom and

related disorders), 14.02 (systemic lupus erythematosus), 14.06 (undifferentiated and mixed

connective tissue disease). R.  23–24.

> The ALJ concluded Christopher retained the residual functional capacity ("RFC") to:
>
> perform light work as defined in 20 CFR 404.1567(b) that allows for two hours of sitting, except [Christopher] can occasionally climb, balance, stoop, kneel, crouch, or crawl. He can tolerate occasional exposure to extreme cold, vibration, and hazards, such as hazardous machinery. There can be no more than moderate noise exposure. He is restricted to simple tasks that can be learned in 30 days or less. There can be no production rate or pace work, defined as having to keep up with an assembly-line that is constantly moving that they have to constantly pay attention, or in a job with strict daily or hourly quotas.

R. 28.

The ALJ found that Christopher has mild limitations in understanding, remembering, or

applying information; interacting with others; and adapting or managing oneself. R. 24–27. He

found that Christopher has moderate limitations with regard to concentrating, persisting, or

maintaining pace. R. 25–26.

At the fourth step, the ALJ found that Christopher is unable to perform any past relevant

work. R. 37. At step five, the ALJ determined that Christopher could perform jobs that exist in

significant numbers in the national economy, such as mail sorter, office helper, storage facility

rental clerk, surveillance system monitor, or order clerk. R. 38. Thus, the ALJ concluded a finding

of "not disabled" was appropriate. *Id*. Christopher appealed the ALJ's decision, and on July 10,

2023, the Appeals Council denied his request for review. R. 1–3. This appeal followed.

## FACTS

### A. Christopher's Background and Testimony

Christopher was born on December 8, 1987. R. 72. He has a high school education and his

past relevant work included employment as a customer service representative and ice cream

mechanic. R. 37, 52.

Christopher is approximately 5'9" and weighs between 205 and 210 pounds. R. 51. He

obtained a GED certificate, as well as a certificate from a technical school. R. 51–52. He has an

estranged wife who lives in Ohio and cares for their two minor daughters. R. 54. At the November

18, 2022 hearing, Christopher stated he lived with his mother. R. 54–55.

Christopher testified that his medical conditions caused him to leave school in June 2019;

however, he did not file his application for benefits until August 2021 when his doctor urged him

to do so. R. 53–54. Christopher experiences headaches two or three times per week. R. 56. He

described each headache as lasting three to four hours, and he explained that his headaches required

him to take medication and stay in dark and quiet areas. R. 57. The headaches can occasionally

cause him blurred vision. *Id.*

Additionally, Christopher testified to experiencing intermittent neck pain three or four

times per week. *Id.* His neck pain typically lasts for an entire day. *Id.* He experiences constant pain

in his lower back and intermittent pain in his upper back. R. 58. He takes gabapentin once or twice

per day to manage his pain. R. 55.

Christopher testified that he is unable to sit for more than ten or fifteen minutes. R. 61. However, he also testified that he is unable to stand in one spot more than fifteen or twenty minutes before he begins experiencing pain in his back, arms, and legs. R. 61. Furthermore, he is able to walk only twenty to fifty feet before he begins to experience pain in his legs. R. 62.

With regard to mental health, Christopher testified that he has difficulty verbalizing his thoughts; concentrating and focusing; processing information; or having meaningful conversations. R. 63–64. He was no longer taking any medication for his mental health issues because the mediations he had previously taken caused side effects. R. 55. He speaks to both his medical provider and his pastor when he has mental health struggles. *Id.*

### B. Medical Treatment

On September 24, 2019, Christopher presented to the care of Dennis Duncan, P.A., at Roanoke Family Medicine to establish care. R. 506–08. Christopher complained of muscular pain that occurs several times per day. R. 506. He had been experiencing the pain for about one year. *Id.* Review of Systems ("ROS") was unremarkable. R. 506–07. Physical examination findings were unremarkable, and his body mass index ("BMI") was 32.8. R. 507–08. PA Duncan diagnosed Christopher with malaise and fatigue and discussed healthy diet and exercise with Christopher. R. 508.

On February 28, 2020, Christopher presented to the care of William Ball, M.D., at Roanoke Family Medicine for an office visit. R. 509–11. Christopher complained of pain throughout his body, which he described as an "aching pain all over with sharp pain in all extremities." R. 509. Christopher also complained of short-term memory loss. *Id.* ROS was positive for musculoskeletal pain. *Id.* Physical examination findings were unremarkable and muscle strength was normal

6

throughout. R. 510. Dr. Ball diagnosed Christopher with generalized muscle weakness, unspecified myalgia and myositis, unspecified insomnia, hyperglycemia, memory loss, diplopia, and other headache syndromes. R. 510. Dr. Ball referred Christopher for an MRI of the brain, as well as a neuropsychological evaluation. *Id.*

On March 12, 2020, Christopher presented to the care of Tracy Scott, PA-C, for an initial neurological evaluation. R. 611–14. Christopher complained of significantly worsening symptoms over the past two years, including intermittent tingling in his upper extremities (primarily his hands) and lower extremities. R. 611. He also reported spasms in his upper and lower extremities. *Id.* ROS and physical examination were unremarkable. R. 612. PA-C Scott assessed Christopher with ataxia, paresthesia of upper extremity, paresthesia of lower extremity, visual disturbance, and cognitive impairment. R. 612–13.

On March 20, 2020, MRI of Christopher's brain revealed small right posterior fossa arachnoid cyst, but no acute infarct, intracranial hemorrhage, brain parenchymal signal abnormalities, or abnormal enhancing masses or lesions. R. 286. Additionally, MRI of the cervical spine revealed degenerative changes of the cervical spine, worse at C5-6 and C6-7. *Id.*

On April 3, 2020, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 512–14. Christopher complained of poor sleep and mixing up words. R. 512. ROS was positive for musculoskeletal pain. *Id.* Physical examination findings were unremarkable. R. 513. Dr. Ball referred Christopher for nocturnal oximetry, as well as for evaluations by a rheumatologist and a hematologist/oncologist. R. 514.

On April 15, 2020, Christopher presented to the care of Garry Bayliss, M.D., at Lewis Gale Rheumatology for an evaluation of myalgia and myositis. R. 292–295. Christopher complained of

muscle pain, joint pain, upper and lower extremity weakness, short-term memory loss, trouble focusing, intermittent blurry vision, headaches, intermittent balance problems, and morning stiffness. R. 292. ROS was positive for diffuse joint discomfort and muscle discomfort. R. 292–93. Physical examination findings were unremarkable. R. 293.  Dr. Bayliss assessed Christopher with myalgia, polyarthralgia, osteoarthritis of cervical spine, cervical degenerative disc disease, arachnoid cyst, cognitive impairment, elevated ferritin level, and paresthesia. *Id.* Dr. Bayliss prescribed 15 mg Mobic for myalgia. *Id.*

On April 22, 2020, Christopher presented to the care of Andrew Fintel, D.O., at Blue Ridge Cancer Center for a virtual oncology consultation. R. 397–99. Christopher complained of muscle and joint pain over the past two or three years, a steady decline in his physical abilities, worsening fatigue, increasingly debilitating joint pain, cognitive issues to include difficulty processing information, and occasional nausea. R. 397. ROS and physical examination findings were unremarkable.[5] R. 398. Dr. Fintel assessed Christopher with hereditary hemochromatosis and recommended Christopher have phlebotomies every four weeks for five months. R. 398.

On May 11, 2020, Christopher presented to the care of Raymond Harron, D.O., for a neurosurgical evaluation. R. 304–08. Christopher complained of balance difficulties, falls, migraine headaches, upper and lower extremity numbness, tingling, and pain. R. 306. Christopher reported that his symptoms had been ongoing for about two years, and he felt his symptoms were worsening. R. 307. Examination findings were unremarkable. *Id.* Dr. Harron diagnosed Christopher with cervicalgia, headache, memory loss, and balance disorder. *Id.* Dr. Harron noted

---

[5] As this visit was virtual, the physical examination findings include only that which Dr. Fintel could observe on video, such as Christopher's general appearance, skin, speech, mood, and affect.

that "[a]rachnoid cysts are usually congenital anomalies and [Christopher] may well have had this cyst for his life." *Id.*

On August 21, 2020, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 515–17. Christopher complained of increased pain, mental fog, and insomnia. R. 515. He reported that his pain was becoming more intense and constant, with intermittent stabbing pains in his arms, legs, and back. *Id.* ROS was positive for musculoskeletal pain. *Id.* Physical examination findings were unremarkable. R. 516. Dr. Ball referred Christopher to undergo diagnostic testing. R. 517.

On August 24, 2020, Christopher returned to the care of Dr. Harron for a follow-up visit. R. 309–12. Christopher reported that chiropractic treatment "helped him pretty significantly." R. 311. Christopher ambulated without assistive devices and did not have any significant gait abnormality. R. 312. Examination findings were unremarkable. *Id.* Dr. Harron reviewed the brain MRI results with Christopher and recommended no surgical intervention. *Id.*

On September 15, 2020, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 394–96. Christopher complained of joint aches, muscle aches, issues with sleep, and issues with memory. R. 394. Christopher reported fatigue after his phlebotomy treatments. *Id.* ROS and physical examination findings were unremarkable. *Id.* Dr. Fintel planned for Christopher to continue undergoing phlebotomies once per month. R. 395. Dr. Fintel indicated that if Christopher's aches, pains, and fatigue continued, then those issues could be unrelated to Christopher's hemochromatosis. *Id.*

On October 14, 2020, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 518–20. ROS was positive for musculoskeletal pain. R. 518. Physical examination findings were unremarkable. R. 519. Dr. Ball started Christopher on 10 mg Lipitor and 200 mg CoQ10. R. 520.

9

On October 27, 2020, Christopher presented to the care of Alan Katz, Ph.D., for a neuropsychological evaluation. R. 320–28. Dr. Katz noted Christopher's medical history included complaints of chronic fatigue, multi-location pain, periodic insomnia, worsening memory problems, double vision, headache, myalgia, and mental fog. R. 320. Christopher presented as pleasant, cooperative, and self-disclosing about his social and medical history. *Id.* His chief complaints related to headaches, aching joints, and muscle pain. *Id.* Christopher reported that his "most troubling symptoms" began in 2018, and included random sharp pain in his arms, legs, and back, as well as progressive memory loss. R. 321.

Regarding Christopher's memory loss, he reported that it was accompanied by struggles with reading comprehension and retention, which he had never struggled with in the past. *Id.* Christopher reported new patterns of inattention, weight gain, emotional and personality changes, decreased patience, and quickness to anger. *Id.* He also reported that he had difficulty finding words, mixed up the names of his children, and struggled to put full thoughts into sentences. R. 322. Christopher denied using recreational substances or tobacco and reported only infrequent alcohol consumption. *Id.*

Christopher identified the following symptoms: loss of sleep; numbness; multi-location pain; muscle tension, TMJ, and migraine headaches; decreased mental energy; lack of initiative; word finding difficulty; problems with planning and following through; forgetfulness; procrastination; irritability; feelings of worthlessness; less control over anger; impulsivity; tension and an inability to relax; and increased symptoms of depression. *Id.* Christopher underwent a neuro-cognitive examination, in which he functioned "well above the average range and perhaps near a superior level," scoring in the 93rd percentile in letter/word reading and in the 84th

10

percentile in mathematical calculation. R. 323. Dr. Katz did note weakness in Christopher's processing speed, which was only in the 50th percentile. R. 324.

Dr. Katz's diagnostic impressions included cognitive somatoform disorder, depression, chronic fatigue syndrome, chronic pain disorder with headaches and soft tissue involvement, and hemochromatosis. R. 328. Dr. Katz recommended (1) starting Christopher on an anti-depressant, such as Wellbutrin, or a long-acting psychostimulant, such as Adderall or Vyvanse; (2) mental health counseling with a cognitive and behavioral emphasis; (3) improving health maintenance behaviors; (4) taking an online course in the computer technology field for mental stimulation; and (5) calendaring to minimize forgetfulness. R. 327.

On November 18, 2020, Christopher presented to the care of Janet Galuppo, PA-C, at UVA Neurology Clinic for a consultation. R. 332–36. Christopher reported changes in his memory that began two or three years prior. R. 333. He also reported sudden changes in his ability to comprehend or retain information, as well as ongoing difficulty with processing information. *Id.* He reported that when his memory problems began, he also began experiencing diffuse body pain primarily located in his arms, legs, and upper back. *Id.* ROS was unremarkable, and physical examination revealed a dulled affect. R. 334. The impression was cognitive change and chronic pain syndrome. R. 335.

On December 2, 2020, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 521–23. Christopher complained of worsening pain, poor sleep, cold intolerance, and severe sensitivity in both legs. R. 521. ROS was positive for musculoskeletal pain. *Id.* Physical examination findings were unremarkable. R. 522. Dr. Ball prescribed 30 mg duloxetine. R. 523.

On December 14, 2020, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 391–93. ROS and physical examination findings were unremarkable. R. 391. Dr. Fintel recommended that Christopher undergo phlebotomies once every three weeks. R. 392.

On January 6, 2021, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 524–26. Christopher reported stopping use of duloxetine because of lethargy. R. 524. ROS was positive for musculoskeletal pain, and physical examination findings were unremarkable. R. 524–25. Dr. Ball started Christopher on 20 mg citalopram and discontinued Christopher on duloxetine. R. 526.

On February 5, 2021, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 527–29. Christopher reported that he had not taken his prescribed citalopram for about four or five days because of anxiety that he did not feel the medication was helping. R. 527. Christopher complained of pain radiating down both legs. *Id.* ROS was positive for musculoskeletal pain, and physical examination findings were unremarkable. R. 527–28. Dr. Ball started Christopher on 40 mg Viibryd and 250 mg Lamisil, and he discontinued citalopram. R. 529.

On March 10, 2021, Christopher presented to the care of Gregory Riebel, M.D., at Virginia Orthopaedic for a lumbar examination. R. 338–41. Christopher complained of neck and back pain, as well as overall body pain throughout bilateral upper and lower extremities. R. 338. Christopher reported that his symptoms began two years prior without any onset injury or trauma. *Id.* Christopher rated his pain at 4/10 on his best day, 7/10 at that time, and 10/10 as his maximum pain. *Id.* Christopher described his pain as aching, stabbing, and burning throughout both his upper and lower back, with similar shooting pain, as well as a "pins and needles" sensation that radiated throughout both upper and lower extremities bilaterally. *Id.* ROS was positive for shoulder pain,

12

wrist/hand pain, knee pain, low back pain, sleep trouble, changes in vision, and feelings of hopelessness. R. 339. Physical examination findings revealed a full neck range of motion with pain. *Id.* Dr. Riebel assessed Christopher with total body pain and wrote that he felt "there is nothing wrong with [Christopher]" and opined that "this seems to be some type of conversion disorder." R. 340.

On March 10, 2021, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 530–32. Christopher complained of increased tiredness, but he stated that he felt that his nightmares have stopped since he began using Zoloft. R. 530. Dr. Ball noted that Christopher was "doing well overall." *Id.* ROS was positive for musculoskeletal pain, and physical examination findings were unremarkable. R. 530–31. Dr. Ball indicated that Christopher would slowly titrate his Zoloft up to 100 mg. R. 532.

On March 30, 2021, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 388–90. Christopher reported a migraine that day, but he decided to have a phlebotomy nevertheless. R. 388. Christopher had some difficulty having his blood drawn. R. 389.

On April 9, 2021, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 533–35. Christopher complained of difficulty sleeping, nightmares, back pain, leg pain, arm pain, and weakness. R. 533. He reported that Lexapro was not helping. *Id.* ROS was positive for musculoskeletal pain, and physical examination findings were unremarkable. R. 533–34. Dr. Ball added fibromyalgia to Christopher's list of diagnoses. R. 535. Dr. Ball started Christopher on 20 mg Lexapro and 50 mg trazodone hydrochloride. *Id.*

On May 19, 2021, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 536–38. Christopher complained of increased pain throughout his body, as well as multiple falls

because of balance and pain. R. 536. Christopher reported that he stopped taking both his trazodone and Lexapro because of side effects. *Id.* Christopher also had student loan disability paperwork for Dr. Ball to fill out. *Id.* ROS was positive for musculoskeletal pain, and physical examination findings were unremarkable. R. 536–37. Dr. Ball discontinued Christopher's Lexapro and trazodone. R. 538.

On June 21, 2021, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 385–87. Christopher reported constant fatigue and joint ache secondary to his fibromyalgia. R. 385. ROS and physical examination findings were unremarkable. *Id.* Christopher underwent a phlebotomy. R. 386.

On September 17, 2021, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 382–84. Christopher reported continuing chronic pain issues associated with fibromyalgia. R. 382.

On October 15, 2021, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 539–42. Dr. Ball noted that Christopher was "overall doing well." R. 539. ROS was positive for musculoskeletal pain, and physical examination findings were unremarkable. R. 539–40. Dr. Ball discontinued Christopher's terbinafine.[6] R. 541.

On January 14, 2022, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 543–45. Christopher reported increased pain and memory issues. R. 543. He also reported that he had been mixing up words while speaking. *Id.* ROS was positive for musculoskeletal pain, and

---

[6] It is unknown from the record when Christopher started on terbinafine.

14

physical examination findings were unremarkable. R. 543–44. Dr. Ball started Christopher on 300 mg gabapentin. R. 545.

On January 18, 2022, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 582–84. Christopher reported his diagnosis of fibromyalgia and reported that his pain had not improved since he started getting phlebotomies. R. 582.

On March 18, 2022, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 628–30. Dr. Fintel noted that Christopher was doing well, although he was continuing to experience pain as a result of his fibromyalgia. R. 628. Dr. Fintel noted a depressed mood, but Christopher reported he was not interested in seeing a counselor or going on any medications. *Id.*

On March 23, 2022, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 600–02. Christopher complained of fibromyalgia pain and reported tinnitus and migraines two weeks prior. R. 600. Dr. Ball continued Christopher on a regimen of gabapentin and started him on 250 mg terbinafine. R. 602.

On April 27, 2022, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 603–05. Christopher reported that he was doing "very well and good." R. 603. Dr. Ball noted that Christopher's gabapentin was working well. *Id.*

On June 14, 2022, Christopher returned to the care of Dr. Fintel for a follow-up visit. R. 631–33. Christopher reported that he was feeling well overall. R. 631.

On September 23, 2022, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 606–08. Christopher reported no changes. R. 606.

On November 11, 2022, Christopher returned to the care of Dr. Ball for a follow-up visit. R. 645–47. ROS was positive for musculoskeletal pain, and physical examination findings were unremarkable. R. 645–46.

### C. Medical Opinions

In a "Discharge Application: Total and Permanent Disability" dated May 19, 2021, Dr. Ball opined that Christopher has "a medically determinable physical or mental impairment that prevents Christopher from engaging in any substantial gainful activity." R. 351. Dr. Ball listed the following diagnosis: fibromyalgia, hemochromatosis, hyperglycemia, and memory loss. *Id.* He described Christopher as "100% disabled." *Id.* Dr. Ball explained Christopher's limitations on sitting, standing, walking, or lifting as "[Christopher] must constantly shift from sitting to standing to reduce pain. Standing, walking, lifting all caused shooting pains." *Id.* Regarding Christopher's limitations on activities of daily living, Dr. Ball explained that Christopher "struggles to remember tasks, [has] difficulty with activities due to pain, balance and fatigue." *Id.* Regarding Christopher's residual functionality, Dr. Ball explained that Christopher had "very limited movement and functionality due to above diagnosis." *Id.* Regarding Christopher's social and behavioral limitations, Dr. Ball explained Christopher had "difficulty with concentration and communication [and] difficulty with memory." *Id.*

In a "Disability Determination Explanation" dated December 15, 2021, Jack Hutcheson, Jr., M.D., a medical consultant with Disability Determination Services, opined that Christopher had the following severe impairments: disorders of the skeletal spine; anxiety and obsessive-compulsive disorders; migraine; fibromyalgia; thrombosis and hemostasis disorder (including

hemophilia); depressive, bipolar, and related disorders; and somatic symptom and related disorders." R. 76.

Dr. Hutcheson opined that Christopher can occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; had no limits in pushing or pulling in the upper or lower extremities; could stand or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and had no postural, manipulative, visual, communicative, or environmental limitations. R. 78.

In that same form, Richard Luck, Ph.D., a psychological consultant with Disability Determination Services, opined that Christopher had mild limitations in understanding, remembering, or applying information; interacting with others; and adapting or managing oneself. R. 76. He opined that Christopher had moderate limitations in concentrating, persisting, or maintaining pace. *Id.* He further opined that Christopher was moderately limited in the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 79. Otherwise, Christopher had no other limitations regarding sustained concentration and persistence. *Id.*

In a "Disability Determination Explanation" dated February 24, 2022, Richard Milan, Jr., Ph.D., a psychological consultant with Disability Determination Services, opined that Christopher had mild limitations in understanding, remembering, or applying information; interacting with others; and adapting or managing oneself. R. 85. He opined that Christopher had moderate

limitations in concentrating, persisting, or maintaining pace. *Id.* Dr. Milan explained that the available evidence "does not suggest a lack of cognitive functioning" and that "[t]he fact that a conversion disorder is suggested and [Christopher] has completely normal exams physically and mentally support the neuropsych statement regarding his tendency to overly focus." *Id.*

## ANALYSIS

Christopher alleges the ALJ erred in his assessment of Christopher's (1) mental impairments; (2) physical impairments and RFC findings; and (3) subjective allegations. *See* ECF No. 8 at 18–36.

### I.   The ALJ's Assessment of Christopher's Mental Impairments

Christopher first argues that the ALJ erred in his assessment of Christopher's mental impairments. *See* ECF No. 8 at 18–24. Specifically, Christopher cites to SSR 96-8p to argue that the ALJ failed to provide an adequate discussion of Christopher's mental health impairments at Step 4. *See* ECF No. 8 at 19. Christopher argues that the ALJ "merely recites evidence then summarily states that plaintiff's moderate limitations in concentration result in a limitation to simple tasks that can be learned in 30 days or less with no production rate or pace work and that plaintiff's moderate limitations in persistence or pace do not result in any limitations in plaintiff's RFC." *Id.*

SSR 96-8p requires an ALJ to include a narrative discussion describing how the evidence supports his conclusion when developing the RFC. *See Teague v. Astrue*, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p at *7; *Meadows v. Astrue*, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24 (W.D. Va. Aug.

18

15, 2012); *see also Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In *Shinaberry v. Saul*, the Fourth Circuit confirmed that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task." *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020) (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)). Nevertheless, *Mascio* does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Id.* In contrast, *Shinaberry* highlights "sister circuits" which conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." *Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). *Shinaberry* further confirms that *Mascio* simply emphasizes the ALJ's duty to adequately review the evidence and explain his decision.

In this case, the ALJ engaged in a robust discussion of Christopher's mental health impairments that incorporated both treatment records as well as Christopher's testimony. *See* R. 24–27. The ALJ does not "summarily account for [Christopher's] limitations in concentration, persistence, and pace by restricting" him only to "simple, routine tasks or unskilled work" as proscribed by *Shinaberry*. Instead, the ALJ accounted for those limitations by restricting

Christopher "to simple tasks that can be learned in 30 days or less with no production rate or pace work," which the ALJ goes on to define as "having to keep up with an assembly-line that is constantly moving that they have to constantly pay attention, or in a job with strict daily or hourly quotas." R. 35.

To the extent that Christopher argues the ALJ should have explained in greater detail how the RFC accommodates his moderate limitations in concentrating, persisting, maintaining pace, or interacting with others, *see* ECF No. 8 at 24, I find no deficiency warranting remand. Instead, the ALJ built "an accurate and logical bridge" from the evidence to his conclusions, and I am not left to guess at how he arrived from one to the other. *See Mascio*, 780 F.3d at 637. Therefore, the ALJ's decision is supported by substantial evidence and so the presiding District Judge should not remand the Commissioner's decision.

## II.    The ALJ's Assessment of Christopher's Physical Impairments and RFC Findings

Christopher claims the ALJ erred in his assessment of Christopher's physical impairments. *See* ECF No. 8 at 24–27. Specifically, Christopher argues that the ALJ failed to conduct a function-by-function analysis in accordance with SSR 96-8p. *See id.* at 25.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. *See* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or

20

ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7. However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2015) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

In *Mascio v. Colvin*, the Fourth Circuit rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that " '[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ engaged in a sufficient narrative discussion of the evidence as required by SSR 96-8p and that discussion contains sufficient information and analysis of Christopher's ability to perform sustained work activities to allow this Court to undertake meaningful review. *See* R. 29–37. The ALJ explains that treatment records, as well as Christopher's own description of his activities, do not suggest more significant physical impairments than are accommodated by the RFC. R. 34. With regard to Christopher's fibromyalgia, for example, the ALJ notes that "[n]o provider prescribed any medication specifically targeted at [Christopher's] fibromyalgia complaints such as Lyrica, Savella, or any other pain medication." *Id.* Overall, the ALJ provided a sufficient narrative discussion and explained how he reached his assessment of Christopher's physical impairments and RFC findings.

Therefore, the Court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Christopher's medical records,

the medical opinions, Christopher's testimony, and the ALJ's conclusions. As a result, the ALJ did not err in his assessment of Christopher's physical impairments and RFC findings, and the presiding District Judge should not remand the Commissioner's decision on that basis.

### III.     The ALJ's Assessment of Christopher's Subjective Allegations

Lastly, Christopher claims that the ALJ erred in his assessment of Christopher's allegations. *See* ECF No. 8 at 27–36. Specifically, Christopher argues that the ALJ improperly discounted his subjective complaints of pain and fatigue. *See id.* at 28.

Under the regulations implementing the Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms. *Id.* at 3, § 404.1529(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* § 404.1529(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of the symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

"The ALJ may choose to reject a claimant's testimony regarding [her] pain or physical condition, but he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence." *Mabus v. Colvin*, 2015 U.S. Dist. LEXIS 38179, *39-40 (S.C. Dist. Mar. 26, 2015) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n. 2 (4th Cir. 1984)). A claimant is entitled to rely exclusively on subjective evidence to prove that his

22

symptoms were so continuous and/or so severe that they prevent him from working a full eight hour day, and an ALJ applies an incorrect legal standard when discrediting a claimant's complaints based on the lack of objective evidence corroborating them. *See Hines v. Barnhart*, 453 F.3d 559, 563, 565 (4th Cir. 2006); *see also Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017) (finding an ALJ "improperly increased the burden of proof by effectively requiring claimant's subjective descriptions of her symptoms to be supported by objective medical evidence"). An ALJ's assessment of the credibility of a claimant's subjective complaints is afforded a high level of deference on review, as the Fourth Circuit has proclaimed such assessments are "virtually unreviewable" on appeal. *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010).

In this case, as noted above, the ALJ's opinion includes a thorough and robust discussion of both Christopher's medical history and his testimony. R. 24–27; 28–35. The ALJ found that Christopher's medically determinable impairments could reasonably be expected to cause his alleged symptoms. R. 33. However, he concluded that Christopher's statements concerning the intensity, persistence, and limiting effects of his alleged symptoms were not consistent with the medical evidence and other evidence in the record. *Id.*

Additionally, Christopher cites to *Brown v. Comm'r Soc. Sec.*, 873 F.3d 251, 269–70 (4th Cir. 2017); *Arakas v. Comm'r Soc. Sec.*, 983 F.3d 83, 100 (4th Cir. 2020) and other similar cases in the Fourth Circuit. In *Arakas*, the Court found that the ALJ's assessment regarding the claimant's daily activities failed to account for "significant other testimony" from the claimant that was at odds with the ALJ's conclusion. *Arakas*, 983 F.3d at 100. In doing so, the Court determined that the claimant's subjective allegations and activities of daily living were consistent. *Id*. This

error is not present in this case. The ALJ explicitly considered Christopher's daily activities, as well as his allegations about his symptoms, and concluded that his reported daily activities suggest a lesser degree of functional loss than generally alleged. R. 33–34. Specifically, the ALJ concluded that "while [Christopher] has impairments, including fibromyalgia and chronic fatigue syndrome, that are reasonably expected to produce the type of pain or discomfort he alleges, his allegations suggest a greater severity of symptoms than can be shown" by the evidence available in the record, and that "[t]he evidence does not document repeated manifestations of fatigue or other symptoms." R. 34. I find that there is substantial evidence to support the ALJ's conclusions in this regard.

In *Brown*, the Fourth Circuit found that the ALJ committed numerous errors, including failing to acknowledge the extent of the activities of daily living, stating:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping . . . The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared his meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities by Brown—showed that he could persist through an eight-hour workday.

873 F.3d at 263.

Here, unlike in *Brown*, the ALJ's assessment shows he understood Christopher's limits in completing his activities of daily living, including difficulties watching TV and reading, going to social gatherings, and following written instructions. *See* R. 28–29. The ALJ, with citations to the record, specifically acknowledged that Christopher participates in his activities and is limited in certain regards, and he explained how the restrictions imposed by the ALJ accommodate those

limitations. *See* R. 34–35. Thus, I find that the ALJ did not err in his assessment of Christopher's allegations, and the presiding District Judge should not remand on this basis.

### CONCLUSION

For the above reasons, I recommend the presiding District Judge **AFFIRM** the Commissioner's final decision and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

Entered: August 2, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge